UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

Case No._____JRR 24 CV 0374

AR

SDC-BALTIMORE
24 FEB 7 PM 1:03

**ELIAS COSTIANES,** Plaintiff

v.

**DEPARTMENT OF JUSTICE,** Defendant

And

**MERRICK GARLAND,** Defendant

And

**MATTHEW GRAVES**, Defendant

And

**FBI,** Defendant

And

**CHRISTOPHER WRAY,** Defendant

And

**JOHN DOES 1-20, unnamed federal law enforcement agents,** defendants

And

**JOHN DOE**, unnamed local law enforcement agent

And

**DC JAIL**, defendant

## COMPLAINT

1

Plaintiff, ELIAS COSTIANES, acting pro se, (herein also "he" "his" and "him"), hereby files this Complaint and states as follows:

## INTRODUCTION

1.      Plaintiff's civil rights were flagrantly violated by the Department of Justice, the FBI, and local law enforcement.

2.      Under a deficient warrant, Plaintiff's house was raided at about 6:00 a.m. on February 12, 2021 by FBI special agents and local law enforcement using military grade equipment, including explosive devices, as if they were capturing Osama Bin Laden. At the time, Plaintiff had no criminal record and no contacts with law enforcement other than traffic violations and was not in any way a flight risk. Plaintiff would have just as easily turned himself in if he had been given a call by law enforcement.

3.      With a deficient warrant, the FBI surveilled Plaintiff for an unknown period of time prior to the raid, but enough time to know that Plaintiff is the primary caregiver for his disabled sister with severe parkinson's disease. With full knowledge of this, Defendants chose to execute this gratuitous and completely unnecessary no-knock raid. In so doing, they caused severe physical and emotional injury to both the Plaintiff and his disabled sister, as well as significant property damages.

4.      Plaintiff has been so thoroughly physically and emotionally traumatized that it has substantially impacted Plaintiff's ability to make a living and to live a normal life as he did before this event. Plaintiff's sister is severely emotionally traumatized and she suffers from post traumatic distress that will surely last for the rest of her life.

5.      Plaintiff is seeking monetary damages for the violation of his civil rights, pursuant to 42 U.S.C. 1983.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(3), and 42 U.S.C. § 1983, which confer original jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges and immunities secured by the laws and Constitution of the United States.  This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred, and continue to occur in this District.

## PARTIES

8.      Plaintiff, Elias Costianes, is an adult male over the age of 18 and resided in Baltimore, Maryland at the time that the events described herein transpired.

9.      Defendants Merrick Garland and Matthew Graves are attorneys who work for the Department of Justice.

10.      Defendant Christopher Wray is the director of the FBI.

11.      Defendants John Does 1-20 are unnamed federal law enforcement officers who participated in the raid on Plaintiff's home.

12.      Defendant John Doe is an unnamed local law enforcement officer who participated in the raid on Plaintiff's home.

## FACTS

1.      Plaintiff is a monetized publisher on YouTube which  required a minimum of 1,000 subscribers. At the time his Youtube channel had just under 10,000 subscribers. His channel has been operating since May of 2012, a full eight plus years prior to January 6, 2021.

2.      Plaintiff covered a wide spectrum of content, including real estate, jet skiing, helicopter tours, music shows, and politics.

3.      For instance, in October of 2020, Plaintiff covered the Black Lives Matter and Antifa riots in the District of Columbia. He recorded rioters fighting with police, including using shields against the police as if engaging in medieval combat. He did not post these videos because the big tech companies were punishing social media influencers like Plaintiff if they exposed what BLM and Antifa were doing. The videos were so violent that they were deemed in violation of the "violent and hateful content" term of service.

4.      Plaintiff also covered peaceful Trump rallies leading up to January 6, 2021. These rallies were completely peaceful without incident. Plaintiff did not see or film any violence whatsoever.

5.      Plaintiff planned to attend the Stop the Steal Rally on January 6, 2021 and film content for his YouTube page.

6.      Plaintiff did not intend under any circumstances to "obstruct an official proceeding."

7.      Plaintiff watched and filmed President Trump's entire speech and posted it on the internet.

8.      After the speech, Plaintiff went to his hotel to use the bathroom. Then he went to the Capitol to film the continuation of the day's events. At no point in time did he anticipate the events that eventually transpired.

9.      When he arrived at the Capitol, he stood about 150 to 200 yards away and recorded for about 20 minutes from a safe distance where he had a good vantage point.

10.    He saw people going up the steps to the Capitol, so Plaintiff followed the story and did the same.

11.    Upon arriving at the top of the steps, he saw about 15 police officers standing off to the side meandering back and forth as if everything was fine. This is all captured on Plaintiff's video.

12.    People started entering the building, so Plaintiff, once again, followed the story and also entered the building. He passed multiple officers and not a single one told him not to enter or attempted to physically block his entrance. This is all captured on video. The video clearly shows that people entering the various entry points of the building, at that time, was peaceful.

13.    Plaintiff was inside for a total of 33 minutes. At no time was he told to leave by any police, security, or other person. Plaintiff continued to film while he was in the building.

14.    For about 90 seconds, Plaintiff entered the public viewing area (the balcony) in the Senate Chamber. He saw someone in military apparel yell "take the laptops, take the paper work, take everything." Plaintiff said, "No! You can't take their stuff." Plaintiff damaged nothing, stole nothing, and harmed no one for the entire time inside and outside the building.

15.    Plaintiff walked out shortly thereafter.

16.    Plaintiff exited the building on the east side. Plaintiff left on his own. Nobody had to tell him to leave. He did not interact with a single officer while he was in the building.

17.    Plaintiff then walked around the outside and filmed some more content for his YouTube channel until his phone died, at which point he returned to his hotel room.

18.    Plaintiff went to sleep and left the next day and went straight to his work in Gambrills, MD, selling real estate.

19.    In the following days, there were no indications that law enforcement were searching for Plaintiff.

20.    In fact, during the year of 2020, there were dozens of violent riots throughout the United States for BLM and Antifa. The FBI did not conduct manhunts for every peaceful protestor or journalist who was at these events.

21.    Little did Plaintiff know, some people in the federal government had decided that January 6 was classified as the worst event in the history of this country since the Civil War, and decided to engage in a manhunt for thousands of peaceful protestors and journalists like Plaintiff · in the largest investigation in the history of this country that still persists until this very day.

22.    This was completely unforeseeable by Plaintiff, and accordingly he had no idea that the authorities were surveilling him and were planning to arrest him.

23.    Prior to this, Plaintiff had never been arrested for anything. Had law enforcement contacted him, he would have certainly turned himself in immediately.

24.    Instead, law enforcement decided to surveil him for an unknown period and then violently raid his house with explosives in the early morning for no reasons.

25.    Defendants did not have a proper warrant.  Pursuant to 28 C.F.R. 50.10(d)(1). All requests for the authorization of the Attorney General to apply for a warrant to search the premises, property, communications records, or business records of a member of the news media must **personally** be endorsed by the United States Attorney or Assistant Attorney General responsible for the matter.

26.    Pursuant to 45 CFR § 1602.2(k) "Representative of the news media means **any person** or entity that gathers information of potential interest to a segment of the public, uses its

editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience."

27.     There is no question that Plaintiff is a member of the news media. He takes raw video and edits it and disseminates it to just under 10,000 subscribers and others who view his content, and gets paid by YouTube for doing so.  One of his videos has 2.8 million views.

28.     The proper procedures were **not** followed as the warrant was not authorized by the Attorney General.

29.     The raid of Plaintiff's home and subsequent treatment was an egregious violation of multiple prohibitions of the Constitution, and completely unAmerican.

30.     At 6:00 a.m., on February 12, 2021, Plaintiff had just woken up and was sitting on the couch in his living room wearing a t-shirt and shorts. He was about to get ready to go to work selling real estate.

31.     Plaintiff's home was an attached townhouse with three bedrooms upstairs, and a dining room, living room, on the ground floor.  Plaintiff was on the ground floor in the living room on the couch.

32.     Plaintiff's senior-citizen disabled sister who Plaintiff cares for was sleeping upstairs in her bedroom.

33.     Suddenly, and without warning, no less than two explosions went off in Plaintiff's dining room, within 10 feet from where Plaintiff was sitting on the couch.

34.     What seemed like an army of soldiers ran in through the broken glass in the backdoor pointing assault rifles at Plaintiff screaming "HANDS ON YOUR HEAD, HANDS ON YOUR HEAD, FBI!"

35.     Plaintiff complied instantly, yet the invading army continued to scream at him while pointing guns at his face, including red lasers that were pointed directly into his eyes, blinding him.

36.     For about 30 seconds that seemed like an eternity, Plaintiff was standing up, his ears were ringing from the explosion, his eyes were burning from smoke and stinging from lasers, his mind was racing, and he held his hands on his head, yet the FBI continued to yell at him as if he was not complying. Plaintiff believed at that moment that they were going to murder him. This traumatic moment has stayed with him to this very day. He continues to see therapy to deal with this. He was diagnosed shortly thereafter for severe PTSD. He has recurring nightmares from this event and has not slept properly since.

37.     Before the explosions, the FBI first had in stealth come around the back of his home and busted through a five foot fence that surrounded the backyard.

38.     Then they came on to the back deck and discharged at least two explosive devices through a glass pane door, causing substantial damage. Then they charged through the broken glass.

39.     Shortly thereafter, Plaintiff's disabled senior citizen sister came down the stairs.

40.     Plaintiff's dog was barking like crazy, so Plaintiff's sister tried to restrain the dog. But the invaders screamed at her to put her hands on her head. Because of her disability, she did not comply immediately as Plaintiff had.

41.     After yelling at her for another 30 seconds that seemed like an eternity, the FBI realized that this elderly lady in a nightgown who was shaking with what are clearly Parkinson's disease symptoms was not a threat.

42.    During that 30 seconds, Plaintiff was certain that his sister was going to be murdered. He was further traumatized by that.

43.    Plaintiff's arms were wrenched behind his back with such force that it tore muscle and tendon tissue in his shoulder, and was handcuffed tightly with his hands behind his back. Plaintiff yelled in pain, and said, "Hey, you are tearing my arm!"

44.    The invaders ignored Plaintiff's cries of pain, which were intentionally not recorded because none of the agents had helmet worn or vest worn cameras to document the raid.

45.    Then they threw him outside. It was **February in Maryland**. It was 15 degrees F and there was snow on the ground. Plaintiff was still wearing nothing but a t-shirt and shorts.

46.    Plaintiff was forced to stand freezing in the snow for as much as 20 minutes for no legitimate reason.

47.    Plaintiff repeatedly told them that they were tearing his arm and ripping his shoulder.

48.    The invaders callously and inhumanly stood by as he sat freezing and in excruciating pain.

49.    This shook Plaintiff's world view. He could not believe that government agents in the United States of America, the "land of the free," would act this way towards a citizen.

50.    Plaintiff noticed at that time that the invaders came with military grade equipment to arrest him. They had an MRAP, which is a "Mine Resistant Ambush Protected" vehicle which is a military grade light tactical vehicle. They also had approximately nine or ten other vehicles, and at least one drone flying in the air.

51.    All of this was completely unnecessary to "apprehend" Plaintiff who would have turned himself in if he were called, or else would have answered the door if they had just knocked.

52.    This "shock and awe" campaign against "internet stars" YouTube influencers was confirmed by Federal Prosecutor Michael Sherwin on the television show 60 Minutes.

53.    Only one agent showed any humanity and after seeing Plaintiff shivering in the freezing cold, told Plaintiff that he could stand close to the MRAP where it was slightly warmer. Even this small gesture of humanity stood out amongst the cruelty exhibited by the rest of the Government agents that day.

54.    After 20 or 30 minutes of this torture, they led Plaintiff back into his home.

55.    Plaintiff saw his disabled sister in her reclining shaking uncontrollably while agents attempted to question her. In the house there was no attempt to properly care for his sister. The only people in the house were dressed in full combat gear including helmets and guns. Plaintiff saw that and was shocked and felt helpless that he could not help his sister who he cares for so deeply.

56.    Plaintiff was still continuously telling the invaders that he was in excruciating pain and that they were tearing his shoulder.

57.    The lead agent, who had just entered the house with Plaintiff, laughed out loud in Plaintiff's face, and said "my shoulder still hurts me from the academy and I retire in two years."

58.    At that time, they finally uncuffed him from the rear and re-cuffed him with his hands in front of him.

59.    They began to question Plaintiff.

60.    They did not read him his Miranda rights. They sat him down in the kitchen and started firing questions at him.

61.    One female agent was holding Plaintiff's phone and demanded that he look at it to unlock it.

62.    Plaintiff at first refused, but eventually felt threatened because he was surrounded by federal agents with guns and had just endured a half hour of torture. Eventually Plaintiff looked at the phone so the phone could be opened with his facial ID. Then they coerced him to provide his passcode as well.

63.    The invaders discovered that Plaintiff had a gun safe with lawfully owned firearms in the basement. The invaders demanded that Plaintiff give them the code, or else they threatened they would drill them open.

64.    They took Plaintiff's laptop, his phone, even his shoes that he wore on January 6. Plaintiff has not received any of that back in almost three years.

65.    Plaintiff was never told that he had a right to an attorney or given an opportunity to call an attorney of anyone.

66.    They did not even allow Plaintiff to be uncuffed to put on pants; instead, one FBI agent awkwardly held his pants so Plaintiff could put them on. Then they released one cuff just long enough for Plaintiff to put on a shirt, then re-cuffed Plaintiff continuing the damage to his shoulder.

67.    Plaintiff was then led to a car and driven with the agent who laughed in his face to DC.

68.    At least 14 people stayed behind with Plaintiff's disabled sister to tear apart the house for "evidence."

69.     The back door was still broken and Plaintiff's disabled sister was sitting alone, terrified in the kitchen by a gaping hole where there used to be a back door.

70.     The invaders gave Plaintiff's disabled sister a phone number to call a random handyman, who came several hours later and charged her $1,500.00 to put up a piece of plywood where there was a door. The total damage to the home was almost $5,000.00. It was totally unnecessary as Plaintiff would have answered the door if they knocked.

71.     On the way to the station in the car, the agent who laughed in Plaintiff's face continued to question Plaintiff without a lawyer.

72.     Plaintiff told the agent that Plaintiff operated a monetized YouTube channel.

73.     Plaintiff noticed that the agent's eyes got big. Plaintiff later learned of the regulation that requires the attorney general to sign off on warrants for members of the media. Plaintiff believes that the agent recognized that they had made a gross policy-violating procedural error before committing their terrorist raid on Plaintiff.

74.     Plaintiff was taken to the FBI office in DC. Another agent at the FBI office bizarrely asked Plaintiff if he had ever read the book, "Echo Chamber." Plaintiff said he had not and asked what it was about. The agent said, "it's about people like you who hear the same thing over and over again and believe it. I am glad they shut down Parlor [an alternative social media app]."

75.     Plaintiff was then taken to a regional jail and was left to sit for three hours.

76.     Then, Plaintiff was cuffed again with his hands behind his back, even though Plaintiff told them that he was still in pain from the earlier damage, but they obviously did not care.

77.     Then he was taken to the DC Jail in a van.

78.    When they arrived at the DC Jail, he was left in the back of the van in a basement parking garage with the van running and the back door wide open for about 30 minutes. During that time he was choking on fumes, freezing cold, and in excruciating pain from his torn shoulder.

79.    Once he got out of the van, he was placed in arm and leg shackles.

80.    He was held in the DC Jail for three hours in a cockroach infested cell. During that time he killed about six large cockroaches about the size of a large pecan with his bare hand to keep them away from him.

81.    One of the guards at the DC Jail asked if Plaintiff was hungry. Plaintiff answered that he was not. The guard shoved two sandwiches in Plaintiff's shirt pocket. Plaintiff believes that the guard did that for no other reason than to draw the cockroaches to the cell, which it did.

82.    After three hours in Jail, Plaintiff was brought before a judge on a phone call because the jail's video system did not work, which Plaintiff believes also violates law.

83.    The judge said on the record, "this is ridiculous. I can only imagine what you have been through today. I am ordering your release immediately." The Judge also said that if Plaintiff was not released in one hour [the Judge] wanted to be alerted.

84.    Plaintiff was released 30 minutes later. Upon information and belief, it usually takes far longer to release a prisoner and this just shows that the Jail does things that are completely unnecessary to cause excessive pain and suffering to citizens like Plaintiff.

85.    Plaintiff was forced onto the street with no money, no phone, wearing only a shirt, pants, socks and shoes, but no jacket or coat or hat, in freezing cold weather after a horribly traumatic day. It was about 5 p.m. and already dark. They walked him out of the parking garage

and just said "get out of here." Plaintiff asked if he could use a phone, but they refused. Plaintiff said, "What am I supposed to do?" to which the DC Jail guard replied, "figure it out yourself."

86.     DC is a very dangerous place. Plaintiff could easily have been murdered by real criminals.

87.     Plaintiff walked up and down the street in front of the jail for almost three hours just to stay warm. There was nowhere to go. It was still during COVID so nothing was open for him to go into. Plaintiff didn't have a phone and therefore could not call UBER, LYFT or a Taxi, and he did not know any numbers to call except for his disabled sister.

88.     Plaintiff finally saw a police officer walking on the street and begged to use the officer's phone to call his sister. The police officer begrudgingly allowed him to. Plaintiff called his disabled sister and asked her to pick him up. She is normally not supposed to drive because of her condition, but this was an emergency. It took her three hours to arrive from Baltimore, normally a one hour drive, to pick him up. She got lost repeatedly, but Plaintiff had no way to reach her. Finally, Plaintiff found a homeless man who had a cell phone, who, unlike the police officer, generously allowed Plaintiff to call his sister and direct her to DC. She was still unable to locate Plaintiff, so Plaintiff told her to just park the car and read the street signs to him. When the plaintiff got an idea of where she might be, he walked about a mile to find her. If not for the homeless man, Plaintiff would not have been able to get home that day, and who knows what could have happened to him or his disabled sister.

89.     This was a really bad day.

90.     It was all totally unnecessary and was inflicted on the plaintiff and on hundreds of others for reasons of political animus.

91.    Plaintiff was diagnosed with severe PTSD shortly after the arrest as a direct result of the trauma inflicted by Defendants. He continues to see a therapist to this day.

92.    His shoulder was and is still permanently damaged. They tore his labrum. He had multiple MRIs and has consulted with multiple surgeons who have said that they do not believe that even surgery will take away the chronic, severe pain that Plaintiff will now live with for the rest of his life.

93.    At the time, Plaintiff was selling homes and had just over 6 million in homes under contract, which would amount to commissions of approximately $150,000.00. Because of the arrest, Plaintiff was fired and lost all of the commissions. Just one week before, Plaintiff had won the "President's Award" for top sales production which was only awarded to him and one other person for the entire state of Maryland.

94.    The shock and awe campaign used against Plaintiff and others was designed to destroy the good reputations of anyone associated with January 6 in a way that is not done to similarly situated protestors for Black Lives Matter or Antifa.

95.    Plaintiff has since been charged with four misdemeanors and the notorious 18 U.S.C. 1512(c)(2). This ridiculous felony essentially supercharges all January 6 trespassers with a felony carrying 20 years in prison. There is no rhyme or reason as to who gets charged with the 1512 and who does not. According to the government's logic, it should apply to everyone who was anywhere in the vicinity of the Capitol, yet they pick and choose who gets it with no explanation offered.

96.    Had the Government been consistent, Plaintiff would not have been raided by explosives and armed intrusion, because in comparison, a man known as Ray Epps was given

two days to turn himself in, and was not dynamically arrested at the time or charged with anything.

97.    On January 9, 2024, Ray Epps was sentenced in DC, which amounted to Probation.

98.    The Government knew of Epps' involvement as early as January 6, 2021 and even included Epps in the most wanted list.

99.    There is video evidence of Epps directing people to the Capitol on the 6th, and the night before (the 5th), repeatedly encouraging people to go "into the Capitol."

100.    There is also video of Epps shoving a large Trump sign into a line of police officers.

101.    Plaintiff did none of this.

102.    After almost three years of not arresting Epps or charging Epps with anything, the Government eventually allowed Epps to turn himself in, and charged Epps with only a single misdemeanor.

103.    The Government explained that the reason Epps was let off so easily was because, although Epps committed felonious behavior, Epps, five times, told some protestors to relax. The Government said that Epps was a "unique" case, as if there was no other January 6 defendant who did anything like that.

104.    Plaintiff, a member of the news media, followed the story, committed no acts of violence or vandalism, had no interactions with police, and told people on video to not steal laptops or paperwork from the Senate chamber, in an attempt to suppress crime.

105.    The Government was fully aware of this. It is even in Epps' indictment.

Apparently, Ray Epps is not "unique." Plaintiff is at least as deserving as the same treatment, and

yet the Government raided his house as if he was Osama Bin Laden and destroyed his life.

106.    On March 8, 2023, at 5:19 PM, Plaintiff filed a report with the Department of

Justice Civil Rights Division, claiming his civil rights were violated. At 5:43 PM on the same

day, the Department of Justice replied to him. They wrote, "After careful review of what you

submitted, we have decided not to take any further action on your complaint." Upon information

and belief, the Department of Justice did not carefully review his complaint, as they only had it

for 24 minutes before sending a reply.

107.    The Department of Justice Civil Rights department claimed that during the 24

minutes that they had his complaint, "Team members from the Civil Rights Division reviewed

the information you submitted. Based on this information, our team determined that the federal

civil rights laws we enforce do not cover the situation you described. Therefore, we cannot take

further action. Your report number is 265748-DML."

108.    The Department of Justice does in fact enforce federal civil rights laws that apply

to law enforcement misconduct including jails and federal officers.

https://www.justice.gov/crt/addressing-police-misconduct-laws-enforced-department-justice.

109.    The Department of Justice Civil Division routinely enforces these laws on behalf

of citizens who were not January 6 defendants.

110.    The DOJ, FBI, Christopher Wray, Merrick Garland, and Matthew Graves

intentionally violated Plaintiff's constitutional rights, including (1) his first amendment right to

free press; (2) his first amendment rights to freedom of speech and assembly by terrorizing him

to the point that his speech and assembly is permanently chilled lest he be subject to further

17

government action; (3) his fourth amendment right to be free from unlawful searches by surveiling without a warrant or with a deficient warrant prior to his arrest; (4) his fourth amendment right to be free from unlawful seizures for the early morning raid and excessive detainment during that traumatic day; (5) his fourth amendment right to be free from excessive force by subjecting him to unreasonable and unnecessary force during that traumatic day; (6) his fifth amendment right to due process for all of the procedural irregularities that he and other January 6ers have been subjected to that are easily proven by public record; (7) his sixth amendment right to an attorney when they deprived him of such; (8) his eighth amendment right to be free from cruel and unusual punishment for all of the cruel and unusual things that they subjected him and his disabled sister to on that traumatic day; (9) his fourteenth amendment right to equal protection under the law by treating him differently than Ray Epps and all of the BLM and Antifa protestors who the government let burn down cities across the country for years and did not hunt them down the way that they did for January 6 defendants.

111.    The unnamed John Doe defendants violated Plaintiff's Fourth Amendment rights to be free of unlawful searches and seizures and excessive force, and his Eighth Amendment rights to be free from cruel and unusual punishment.

112.    The DC Jail violated his eighth amendment rights to be free from cruel and unusual punishment for the reasons stated above, including intentionally placing him in a cell crawling with numerous cockroaches that are known to transmit disease, and leaving him alone to freeze in the cold in DC. They also violated his civil and human rights by being deliberately and indifferent to his suffering.

## PRAYER FOR RELIEF

A. An order declaring the Defendant's conduct to be unlawful and unconstitutional;

B. An order enjoining the Defendants from continuing to engage in conduct found to be unconstitutional;

C. An order awarding damages for violations of Plaintiff's Constitutional rights;

D. Any other relief, including attorney's fees, the Court judges to be proper, and/or is permitted by statute, including but not limited to 42 U.S.C. § 1988.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action on all issues triable.

Dated: February 7, 2024

Signed:

Elias Costianes